

**SIGNED this 25 day of January, 2006.**

_____
R. Thomas Stinnett
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | |
|---|---|
| In re: | No. 01-17271 |
| | Chapter 7 |
| NORTH AMERICAN ROYALTIES, INC. | |
| WHELAND HOLDING COMPANY, INC. | |
| WHELAND MANUFACTURING COMPANY, | |
| INC., and WHELAND FOUNDRY, LLC. | |
| | |
| Debtors. | Jointly Administered |

**MEMORANDUM ON UNION'S REQUEST
FOR EVIDENTIARY HEARING**

The bankruptcy trustee in the case of North American Royalties (NAR) has objected to a claim filed by the United Steelworkers of America (the Union). The Union's claim is for $17,000,000 in damages caused by the termination of *future* medical and life insurance benefits for retirees. In his objection to the claim, the trustee contends that even if the Union had such a claim, which the trustee denies, it released the claim as part of a contract with NAR known as the

termination agreement.[1]  This memorandum deals only with the Union's request for an evidentiary hearing to present parol evidence on the question of whether the termination agreement was intended to release the Union's claim.[2]

The court can grant the Union's request and hear parol evidence on the question of whether the termination agreement was intended to release the Union's claim only if the termination agreement is ambiguous on that point. If the termination agreement unambiguously did or did not release the Union's claim, then the court has no reason to consider parol evidence. *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449 (7th Cir. 1991), *cert. den.* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The facts are set out in more detail below.

NAR and several related corporations filed bankruptcy cases at the same time, and their bankruptcy cases are being jointly administered. The retiree benefits may actually have been provided by one or more of the related corporations, but for convenience, the court will refer only to NAR as the debtor in bankruptcy, the provider of the retiree benefits, and the other party to the termination agreement.

---

[1] The court has not been furnished a copy of the Collective Bargaining Agreement (CBA) between NAR and the Union.  This memorandum presupposes the Union can establish a contractual right for its retirees to future medical and life benefits.  Whether the Union can do so is questionable.  In its Motion to Authorize Termination of Certain Non-Pension Retiree Benefits (Doc. #344), NAR alleged:

> ". . . .
>
> 8.  All of the applicable Hourly Plans and Salaried Plans contain an express reservation of rights allowing NAR unilaterally to terminate or modify the benefits provided thereunder at any time. . . ."

Although the Union failed to respond to this motion, it was decided on NAR's alternate theory as to the Hourly Plans. *In re North American Royalties, Inc.*, 276 B.R. 860 (Bankr. E.D. Tenn. 2002).

[2] The Union's proof of claim includes a separate claim for $12,000 based on a grievance filed by an employee.  This memorandum does not deal with that claim in any way.  It deals only with the Union's $17,000,000 claim for damages.  When the court refers to the Union's claim, it means the $17,000,000 claim for damages.

NAR filed its bankruptcy case under chapter 11 of the bankruptcy code. Chapter 11 provides for reorganization of the debtor so that the business can continue, but a chapter 11 case can also be used for liquidation. As usual in a chapter 11 case, no bankruptcy trustee was appointed, and NAR served as debtor in possession. 11 U.S.C. §§ 1104 & 1107. During the chapter 11 case, NAR and the Union entered into the termination agreement. It provides for termination of the CBA including various benefit plans for NAR's employees and retirees, other than the pension plan. The pension plan was fully funded and has continued to pay benefits. Indeed, since the pension plan appeared to be over funded, the termination agreement provided an enhancement of the pension benefits -- relaxation of the standards for granting a pension -- to the extent the pension fund could afford it.

By the time the Union and NAR entered into the termination agreement, the Union realized that NAR's bankruptcy case was a liquidating chapter 11. The Union knew NAR would not continue in business and would not have income to continue funding the benefit plans that were to be terminated.

The $17,000,000 claim is for damages caused by termination of the medical and life insurance benefits for the retirees who were *hourly* employees. NAR did not cancel or reduce these benefits before they were terminated on the date set by the termination agreement. Thus, the Union's claim is for damages to the hourly retirees as the result of NAR's failure to continue their medical and life insurance benefits into the future, past the agreed termination date.

The trustee's objection reveals that he has interpreted the Union's proof of claim to include other kinds of claims. The Union's response makes clear the nature of the $17,000,000 claim. In this regard, the termination agreement dealt with at least three kinds of benefits: (1) the pension plan for retirees; (2) insurance and other benefit plans for current employees; and, (3) medical and life insurance benefit plans for retirees who had been hourly employees. The Union's reply to the trustee's objection limits the Union's claim to damages resulting from the termination

3

of the medical and life insurance for hourly retirees. This is the only plausible argument by the Union in light of the provisions of the termination agreement, the court's earlier decisions approving it, and other case law from this district. *In re North American Royalties, Inc.*, 276 B.R. 860 (Bankr. E. D. Tenn. 2002); *In re North American Royalties, Inc.*, 276 B.R. 587 (Bankr. E. D. Tenn. 2002); *Southern Labor Union v. Blue Diamond Coal Co. (In re Blue Diamond Coal Co.)*, 160 B.R. 574 (E. D. Tenn. 1993) (employees without claim for terminated benefits).

The court must decide whether the termination agreement *unambiguously* did or did not release the Union's present claim. The bankruptcy trustee and the Union do not agree on the scope of the release provision in the termination agreement. The release provision appears in paragraph 6 of the termination agreement, which provides:

> ENTIRE AGREEMENT. By this Agreement, the parties acknowledge that each had the opportunity to discuss, make proposals and resolve all issues with respect to the closure of the Chattanooga plants and its effect on the employees. This Agreement resolves all outstanding issues and sets forth the full terms and understandings that the parties have reached regarding the closure and termination of employees. This Agreement is final settlement of all issues regarding the closure and termination of employees, and the Union agrees that this Agreement fully releases and discharges any obligation of the Company.

The first clause of the third sentence provides that the termination agreement is the final settlement of all issues "regarding the closure and termination of employees." The second clause of the sentence releases "any obligation" without additional description. The trustee contends the release of "any obligation" means any obligation under the terminated benefit plans and any obligation, including liability for damages, resulting from termination of the benefit plans.

The Union contends the release of obligations is subject to the limiting phrase -- regarding the closure and termination of employees – used earlier in the same sentence to describe the issues being settled. The same limiting phrase or its equivalent appears in the two preceding sentences in paragraph 6.

This is only the first step in the Union's argument, which can be summarized as

follows. First, the limiting phrase – regarding the closure and termination of employees – applies not only to the settlement of issues but also to the release of obligations. Second, the limiting phrase may not appear to be appropriate wording to exclude the Union's claim from the release. Third, the other provisions of the termination agreement and the basic facts surrounding its creation reveal that the limiting phrase can be interpreted as appropriate wording to exclude the Union's claim from the release. Fourth, it follows that the release of obligations, as modified by the limiting phrase, is ambiguous as to whether it included the Union's claim.

The court need not reach a decision on the first step of the Union's argument – whether the limiting phrase applies to the release – because a decision in the Union's favor would not prove the release is ambiguous as to the Union's claim and would not entitle the Union to an evidentiary hearing to resolve the ambiguity. The court assumes, for the purpose of argument, that the first step of the Union's argument is correct; that is, the court assumes the limiting phrase applies to the release. This assumption allows the court to deal with the main question, whether the release with the limiting phrase is ambiguous as to the Union's claim, but first a procedural note.

The first step of the Union's argument proves the termination agreement is ambiguous as to whether the limiting phrase applies to the release. Other courts have found ambiguity in similar provisions and have heard parol evidence on the parties' intent. *American Freight System, Inc. v. Electrolert, Inc. (In re American Freight System, Inc.)*, 187 B.R. 692 (D. Kan. 1995); *Rickel & Associates, Inc. v. Smith (In re Rickel & Associates, Inc.)*, 272 B.R. 74 (Bankr. S. D. N. Y. 2002). If the court decides in the Union's favor on the main question of ambiguity, the evidentiary hearing can also deal with this preliminary ambiguity.

The Union has the burden of proving that the release with the limiting phrase is ambiguous as to the Union's claim. *Pabst Brewing Co. v. Corrao*, 940 F.Supp. 217 (E. D. Wis. 1996). The parties have relied on Tennessee law as to ambiguity and parol evidence. They have

5

not cited any federal statutes that adopt or create a parol evidence rule for this situation or rules for interpreting the termination agreement. It appears, however, that the court should apply general rules of contract law (federal common law) because the termination agreement deals with labor and benefit agreements that were (as far as the court knows) governed by federal law. *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576 (6th Cir. 2002); *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), *cert. den.* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998); *International Union, United Auto., Aerospace, and Agr. Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983); *Rossetto v. Pabst Brewing Co.,* 217 F.3d 539 (7th Cir. 2000).

The trustee relies partly on the argument that the agreed termination, by its very nature, should have released all claims under the benefit plans and all claims for damages based on termination of the benefit plans as a breach. When the parties agree to terminate a contract, however, the termination agreement can preserve a claim for damages that would otherwise be settled and released. The Union argues that the termination agreement with NAR had that effect, that it was intended to preserve the Union's claim, but the wording is ambiguous. The Union's argument does not completely sidestep the trustee's argument. The point of the trustee's argument is that the limiting phrase can not be interpreted to exclude the Union's claim from the release. The underlying theory is that if the phrase was intended to distinguish between released and unreleased claims, it should have made the distinction according to the grounds of liability (the bases for the claims) or at least the issues relevant to liability, but the limiting phrase does not meet this basic criterion for a phrase intended to exclude a claim from a release.

In the context of the Union's request for an evidentiary hearing, the court need not deal with the ultimate question of whether NAR is liable for the damages asserted in the Union's claim. The court notes that all the documents and other facts relevant to liability are not yet in evidence in this proceeding, and likewise, the parties have not argued the law in light of those facts. If the Union can otherwise prove the existence of the alleged ambiguity, then the court can deal with

the question of whether the limiting phrase makes sense as an exclusion from the release in light of the facts and law regarding NAR's liability.

The trustee's main argument against ambiguity is much simpler. It begins with an obvious fact. As a practical matter, NAR's cessation of business – its closure and termination of employees – caused termination of the retiree benefit plans. Indeed, NAR's closure and termination of employees caused all the problems dealt with in the termination agreement. The limiting phrase, in the trustee's view, is not a limit but simply a description of the events leading to the problems dealt with in the termination agreement. Two results follow. First, as a matter of interpretation, the limiting phrase is really a descriptive phrase that makes the scope of the settlement and release the same as the scope of the termination agreement. Second, as a practical result, the release of obligations "regarding the closure and termination of employees" released NAR's obligations under the retiree benefit plans or arising from their termination, such as the Union's claim for damages.

The trustee's argument has the attraction of simplicity. It also fits with the facts and the broad wording of paragraph 6. The Union's argument is more complex. The Union contends the limiting phrase was intended to exclude some obligations from the release, including the Union's claim for damages. The obvious problem with the Union's argument is the wording of the limiting phrase. At first glance, and maybe second, it does not strike the court as appropriate to exclude any kind of obligation from the release. The Union's arguments are directed at explaining why the limiting phrase was appropriate language to exclude some obligations from the release, such as the Union's claim for damages, but not other kinds of obligations.

The Union's interpretation of the limiting phrase is briefly stated, but it seems to include the following reasoning. The settlement and release dealt with continuing obligations under the employee and retiree benefit plans. This is why paragraph 6 refers to issues and obligations regarding NAR's closure and termination of employees. The limiting phrase prevents the settlement and release from applying to the Union's claim for damages because it was not an issue or

7

obligation having to do with NAR's continued operation and employment of union members or NAR's closure and termination. This result is supported by the failure of the settlement and release to mention claims for damages, as is commonly done in a settlement and release. In summary, the termination agreement relieved NAR from the obligation to continue funding the retiree benefit plans, but it did not release the Union's claim for damages caused by NAR's failure to continue the retiree benefit plans because the "obligation" for damages was not related to NAR's closure or termination of employees.

The Union is assuming that NAR's liability does not turn upon the effect of NAR's closure and termination of all union employees. Under non-bankruptcy law, however, either event or the combination may have ended the retiree benefit plans or allowed NAR to terminate them, *without being liable for damages*, because the retirees had no right to future benefits and NAR had no obligation to provide them.

In this regard, the court has already mentioned the relevance of possible grounds for liability (bases for a claim) to the wording of a phrase intended to exclude a claim from a release. The same reasoning applies to defenses. Suppose that when the Union and NAR negotiated and drafted the termination agreement, they knew that the CBA, the benefit plans, and relevant non-bankruptcy law raised the possibility that NAR's closure and termination of employees would relieve it from liability under the retiree benefit plans, including liability for damages resulting from termination. If so, the Union would not have chosen the wording of the limiting phrase to save its claim from the release; the wording would have had the opposite effect. This reasoning reflects again on the basic problem with the Union's argument: the wording of the limiting phrase appears to be concerned with background facts leading up to the termination agreement, not with particular issues regarding NAR's liability for damages as the result of termination.

This brings the court back to the Union's argument that the limiting phrase can be understood as making a distinction between potential claims for damages arising from the

8

termination. The Union's argument is not clear as to whether the limiting phrase was supposed to distinguish between damage claims by retirees and damage claims by employees. A former employee generally can not have a claim for damages based on the loss of future employment benefits because the right to the benefits is conditioned on continued employment. *Southern Labor Union v. Blue Diamond Coal Co. (In re Blue Diamond Coal Co.)*, 160 B.R. 574 (E. D. Tenn. 1993). According to this reasoning, the limiting phrase makes sure the release applies to damage claims by employees because they are claims (obligations) regarding NAR's closure and termination of employees. In summary, the argument is that the wording of the limiting phrase has the correct effect; it excludes the retirees' claim for damages from release but allows release of the non-existent or highly doubtful claims by employees.

This argument would likely fail if the termination agreement used "employees" to mean both employees and retirees, but it does not. Retirees are mentioned specifically in the paragraph that continues the retiree benefit plans until April 30, 2002. The preceding paragraph refers to eligible employees who are participants in the pension plan. Since the paragraph adopted a change in the pension plan to relax the eligibility requirements, "employees" meant employees who were eligible to retire, not retirees. *In re North American Royalties, Inc.*, 276 B.R. 587 (Bankr. E. D. Tenn. 2002).

The Union relies more on the argument that the termination agreement can be correctly understood only in light of its purpose under the facts and law leading up to the agreement. Section 1114 of chapter 11 required NAR to continue the retiree benefits as they were before NAR filed bankruptcy except: (1) NAR and the Union could agree to changes after good faith bargaining; (2) if they could not agree to changes after good faith bargaining, the court could order changes to the extent necessary to allow NAR to reorganize; (3) the court could order emergency interim modifications before completion of the process for obtaining court ordered modifications. 11 U.S.C. § 1114(e), (f), (g), (h). Section 1129(a)(13) requires a chapter 11 plan to continue the

benefit plans as modified. 11 U.S.C. § 1129(a)(13). Neither § 1114 nor § 1129(a)(13) distinguishes between a reorganizing chapter 11 debtor and a liquidating chapter 11 debtor. The Union realized, however, that the retiree benefit plans would be terminated. It also knew that they needed to be terminated so that NAR could propose a liquidating chapter 11 plan without a provision to continue the benefit plans. In summary, the Union and NAR needed to end NAR's duty to continue funding the retiree benefit plans, but since NAR's case was a liquidation, the Union would not have chosen to give up a possibly valid claim for damages to the hourly retirees caused by termination of their medical and life insurance benefits, especially without any compensation, and the termination agreement provides no compensation except a very short continuation of the benefits. The provisions of the termination agreement reveal the Union's other concerns: terminating the collective bargaining agreement entirely; continuing the pension plan with necessary adjustments to comply with the pension laws; requiring NAR or a successor to recognize and bargain with the Union if manufacturing operations were restarted. In summary, the Union contends that none of the provisions of the termination agreement reveal any concern with the Union's claim; they do not reflect any bargaining over whether to release such claims, and release would not have made sense in the context.

As to this argument, the court can consider undisputed background facts, such as the relevant bankruptcy law and the Union's knowledge of NAR's imminent demise at the time of the termination agreement, without violating the parol evidence rule. The purpose or meaning of the limiting phrase is not obvious. *International Union, United Auto., Aerospace, and Agr. Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) (context needed even for explicit language); *Upholsterers' Intern. Union of North America, AFL-CIO v. American Pad & Textile Co.*, 372 F.2d 427 (6th Cir. 1967) (contractual history); *see also Rossetto v. Pabst Brewing Co.*, 217 F.3d 539 (7th Cir. 2000) (latent ambiguity).

This argument differs from the earlier argument. The former attempted to explain

how the limiting phrase operates correctly – how its wording allows the release of obligations the parties intended to release but excludes the Union's claim from the release. This argument is more general. It makes the point that the parties were concerned primarily with stopping the flow of NAR's money into the benefit plans, and the scope of the release should be determined from that perspective.

The Union makes another argument paralleling the argument that the termination agreement was primarily intended to end NAR's duty to continue funding the benefit plans. This argument is that the word "obligation" does not suggest liability for damages arising from termination of the benefit plans. The conclusion is suggested by the Union's argument that the settlement and release would have mentioned claims or liabilities for damages if it had been intended to include them.

The word "obligation" can have a broad enough meaning to include liability for damages, but it can also be viewed as suggesting a continuing duty instead of a liability created by the termination for failure to carry out the duty. This reasoning requires a comment on general methods of drafting of a release. A settlement and release will often use a multitude of nouns and adjectives to make sure it disposes of every last problem that might arise out of the underlying facts. Another approach is to use one word but to include a broad definition of that word in the agreement. The two methods may even be combined. This settlement and release does not follow any of those patterns. This suggests the word "obligation" may need to be explained.  The court agrees that "obligation" suggests, at least slightly, the continued funding of the benefit plans instead of liability for damages resulting from breach or termination.

Any word has a range of meanings, and that range should not be used to manufacture ambiguity. This problem does not exist with regard to the meaning of  "obligation" because the termination agreement itself and the Union's other arguments provide at least some support for a limited meaning. The termination agreement does necessarily lead to the broad

interpretation of "obligation" favored by the trustee. *Compare Edwards v. Travelers Indemnity Co.*, 201 Tenn. 435, 300 S.W.2d 615 (1957), *and Snelling and Snelling, Inc. v. Parnell*, 59 Tenn.App. 258, 440 S.W.2d 23 (1968).

This brings the court to the point of deciding whether the Union has made out a case for ambiguity. Depending upon additional facts, the Union's argument as to the purpose and context of the termination agreement may have some viability. The Union would *not* have released the hourly retirees' potential claim in a liquidating bankruptcy case for damages caused by termination of their insurance benefits. At least this is true *if* the potential claim by the hourly retirees was not obviously lacking in merit to the point that the Union would not have attempted to preserve it and NAR would have demanded its release. Likewise, if the hourly retirees' potential claim was that weak, the court would not expect to see in the termination agreement any substantial benefit or compensation to the Union or the hourly retirees in return for giving up the claim. That could explain its absence from the termination agreement.  The court does not know the relative strength or weakness of the hourly retirees' potential claim. If the court assumes, as it must at this stage of this contested matter,[3] the parties knew the hourly retirees had a claim for damages, this may bear on the question of whether the limiting phrase causes the release to be ambiguous as to the Union's claim.

The three consecutive uses of the limiting phrase or its equivalent suggest the Union and NAR thought it was an important description, but the wording does not reveal an obvious reason for its importance – unless the trustee's argument is correct.  The phrase was  not a very good choice of words if the parties used it to make the settlement and release broad in scope, as broad as the scope of the termination agreement.  The use of the single word "obligation" in the release also raises a question as to what the parties intended to accomplish. The basic facts and

---

[3]See footnote 1.

bankruptcy law leading up to the termination agreement also provide limited support for the Union's argument that the release is narrower than it appears to be.

In this regard, the release is worded broadly, as the trustee argues, and the limiting phrase does not appear to be a limit.  The Union's interpretation of the limiting phrase is technical and seems to overburden the words. To justify a hearing, however, the Union need not convince the court that its claim was excluded from the release. The Union's interpretation of the release is not totally illogical, and it is not clearly inconsistent with the remainder of the termination agreement or the facts. The termination agreement itself and the basic facts and bankruptcy law leading up to execution of the termination agreement raise a reasonable doubt as to the meaning of the limiting phrase. The court concludes that the release is ambiguous as to the Union's claim – if the limiting phrase applies to the release. The court concluded earlier that the termination agreement is ambiguous on the preliminary question of whether the limiting phrase does apply to the release.

Because the issue of liability is a key point in deciding the meaning of the limiting phrase, the evidence as to liability will be part of the evidentiary hearing. The court and the parties will save time in the long run if the hearing deals with the question of liability. For the sake of efficiency, the evidentiary hearing will deal with the ultimate question of whether NAR is liable for the alleged damages under the controlling agreements and the relevant non-bankruptcy law, and the amount of such damages.

The court will enter an order setting an evidentiary hearing and requiring further briefs.